UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**GARFIELD HECTOR,**

**PLAINTIFF,**

**V.**                                          **5:05-CV-214**

**CHASE-PITKIN HOME & GARDEN/WEGMANS FOOD
MARKETS, INC., BRIAN MCNEILL AND ROBERT
LYONS,**

**DEFENDANTS.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Garfield Hector
Plaintiff *pro se*

Harter Secrest & Emery LLP
Amy L. Hemenway, Esq., of Counsel
Twelve Fountain Plaza, Suite 400
Buffalo, New York 14202
Attorneys for Defendants

**Hon. Norman A. Mordue, Chief U.S. District Judge**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

In this *pro se* action alleging employment discrimination under 42 U.S.C. § 2000e, *et seq.*

("Title VII"), defendants move (Dkt. No. 45) for summary judgment. Plaintiff has submitted no

opposition to the motion. For the reasons set forth herein, the Court grants the motion and

dismisses the action.

**SECOND AMENDED COMPLAINT**

Plaintiff commenced this action on February 18, 2005. A very brief summary of

plaintiff's second amended complaint (Dkt. No. 9) is as follows. Plaintiff, an African-American male, was employed by defendant Chase-Pitkin Home & Garden/Wegmans Food Markets, Inc. ("Chase-Pitkin") as Front-End Advisor in Chase-Pitkin's Dewitt, New York store from April 2, 2001, until he was terminated on July 6, 2004. Defendant Brian McNeill ("McNeill") was General Store Manager. Robert Lyons ("Lyons") was Personnel Manager.[1]

In the second amended complaint, plaintiff alleges that when he applied for employment at Chase-Pitkin in April 2001, he was required to undergo a criminal background check, whereas no white applicants were required to do so; that Lyons and McNeill hired him; that they promised him management training and promotions; that he applied for promotions in 2002 and 2003, but the positions were given to less qualified white employees; that Lyons and McNeill refused to promote blacks to management positions but rather promoted less qualified white employees; that Lyons and McNeill promoted female employees in exchange for sex and to avoid sexual harassment law suits; that as a result of conflicts and confrontations between employees due to their personal relationships, the workplace was "hostile," making it difficult for plaintiff to carry out his supervisory duties; and that as a result of the foregoing, plaintiff suffered discrimination on the basis of race and gender.

Plaintiff further claims that when he complained of racial discrimination and sexual misconduct, Chase-Pitkin's management retaliated against him by repeatedly falsely accusing him of overages and shortages on his cash register; that many employees use each cash register every day, making it impossible to ascertain who is responsible for any overages or shortages;

---

[1] Lyons is not a party to this action; although he is named as a defendant in the second amended complaint, he was not served with process (see Dkt. No. 40).

that on August 8, 2003, Lyons and McNeill offered to pay him $656 to stop making complaints of discrimination and misconduct and to sign a statement that he was not discriminated against; that on July 6, 2004, Lyons and McNeill terminated him, falsely stating that his termination was for misconduct due to overages and shortages in his cash register; and that he was actually terminated in retaliation for filing discrimination and misconduct complaints.

On August 23, 2004, plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") complaining of harassment and discriminatin on account of race and sex.  On November 24, 2004, EEOC issued a Dismissal and Notice of Rights.

## THE MOTION

Defendants move (Dkt. No. 45) for summary judgment.[2]  Plaintiff has submitted no opposition.  Accordingly, the Court reviews defendants' submissions to determine whether defendants have met their burden of demonstrating that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law.  In so doing, the Court views the evidence in the light most favorable to the plaintiff and draws all reasonable inferences in plaintiff's favor.

The facts on which defendants rely are set forth in defendants' Statement of Material Facts, with specific citations to admissible evidence in the record, including documentary evidence and declarations from McNeill and Margaret Riley, Chase-Pitkin's Director of Human Resources and Training at the times in question.  McNeill and Riley explain, with documentary

---

[2] Defendants' motion papers included the required Notice to *Pro Se* Litigant of the Consequences of Failing to Respond to a Summary Judgment Motion.  *See* N.D.N.Y. L.R. 56.2.

support, that Chase-Pitkin maintained a policy of non-discrimination and non-harassment and had

procedures in place for addressing complaints.  Employees were informed of the policy and

procedures by various means, including the employee handbook, a copy of which was provided to

plaintiff during his orientation on April 2, 2001.

Plaintiff was employed full-time by Chase-Pitkin as Front-End Advisor from April 2,

2001 through July 6, 2004.  Prior to his employment, plaintiff was required to undergo the

standard physical examination and drug screen test required for all full-time employees.

According to both McNeill and Riley, he was not required to complete a criminal background

check at any time.

The record includes a copy of the job description for Front-End Advisor.  As Riley

explains, plaintiff's duties included supporting front-end operations by supervising front-end

cashiers, processing sales and refunds through the cash register, assisting customers, and cashing

out customers as needed, both at the service desk and in the regular cash lanes.  Front-End

Advisors report directly to the Front-End Manager and, in the Front-End Manager's absence, to

the Store Manager and/or Assistant Store Manager.  Apart from acting as "E-3 Ambassador" for

three months for the Dewitt store in connection with web-based employee training, plaintiff held

no other position at Chase-Pitkin.

During his employment at Chase-Pitkin, plaintiff applied for and was denied promotion to

the positions of Seasonal Manager and Front-End Manager.  McNeill's declaration explains the

promotion decisions as follows.  Plaintiff applied for the Seasonal Manager position in July 2002.

After interviewing plaintiff and other applicants, Lyons and McNeill determined that Timothy

O'Leary, another full-time employee at the Dewitt store, was the best qualified applicant.

-4-

McNeill explains:

> [I]n the three months preceding his promotion to Seasonal Manager, O'Leary had served as Acting Seasonal Manager at the Dewitt store and had performed well in the position. Lyons and I observed that O'Leary was able to exercise good leadership skills and handle necessary merchandising, sales and payroll issues during the department's busy season.  O'Leary also had prior sales experience in the Dewitt store's paint department. By contrast, Hector did not have any relevant sales experience at Chase-Pitkin, having always been stationed on the front-end, let alone experience managing the Seasonal Department. Lyons and I did not consider Hector's prior managerial experience with Ames, Sears, and Advance Auto Parts to be as relevant to the position as O'Leary's direct experience in the Seasonal Department at Chase-Pitkin.

With respect to the Front-End Manager position for which plaintiff applied in July 2003, McNeill explains that he and Lyons interviewed plaintiff and other applicants and concluded that another Front-End Advisor, Kristen Beck, was the best qualified.  Beck had worked at Chase-Pitkin since August 2000, had previously worked for five years as a front-end supervisor/inventory manager for another home improvement chain, and had demonstrated a strong understanding of the front-end procedures and systems.  McNeill states: "Given the types of products told by Chase-Pitkin and the high volume of commercial customers, Lyons and I determined that Beck's direct experience in the home improvement arena was more pertinent than Hector's prior managerial experience at non-home improvement stores."  McNeill added: "Beck had also demonstrated a strong understanding of all of the necessary front-end procedures and systems, which was considered an important skill set for a front-end manager."  McNeill said plaintiff's race was not a consideration in either determination.

On or about March 13, 2003, three female front-end cashiers under plaintiff's supervision at the Dewitt store complained to Lyons about unwelcome touching and comments by plaintiff. After meeting with each complainant and obtaining written statements (which are included in the

file), Lyons and Operations Manager Jim DeWolfe met with plaintiff on March 19, 2003. According to Lyons' notes of the meeting, plaintiff denied the allegations and stated that white females are trying to get rid of him because he is African-American and that no one likes him because of his management style.

Plaintiff submitted a written statement dated March 19, 2003, entitled "Racial Harassment of Garfield Hector African-American Male Employee."  Plaintiff refers to the three complaints as racially-motivated false harassment by white employees under his supervision.  He states that the white employees regularly make the same type of comments he is accused of making and that such comments are part of "everyday work norm" and "store culture."  Plaintiff's written statement relates extensive detail concerning what he perceives as disrespectful conduct towards him by employees whom he supervises and their resistance to his supervisory decisions on matters such as work assignments.  He also states that he overheard conversations among other employees stating that they do not like him and want to "get rid of" him.  He expresses his view that these problems stem from racism, but he fails to set forth any non-conclusory allegations supporting this view.

On April 4, 2003, Lyons and McNeill met with plaintiff to conclude the investigation. They reviewed Chase-Pitkin's non-harassment policy with plaintiff and, as McNeill states in his declaration, "advised Hector that because his role as Front-End Advisor involved supervising other employees, he needed to be careful to maintain a positive and professional attitude and also pay closer attention to his interactions with other employees."  Plaintiff submitted a second written response, dated April 3, 2003, primarily complaining about the sexual content of conversations among the employees.  He includes a conclusory statement that his coworkers

-6-

complained about him because he was the only full-time African-American supervisor.

Plaintiff submitted a written complaint to management dated December 2, 2003, setting forth his thoughts about the "racial bias" that Chase-Pitkin employees have towards him. He complains that he has been harassed since the first day on the job, that he has not been given the tools and training that white employees receive, that his supervisor Kristen Beck speaks to him in a disrespectful tone of voice, that she verbally abused him for making a mistake regarding a customer gift card, and that he is treated with hostility because he is not part of the employees' "click" and does not involve himself in "employee drama." The complaint does not relate a single specific racial comment or any concrete basis for believing that the events of which he complains are related to his race.

The file shows that, during his employment with Chase-Pitkin, plaintiff was counseled on three occasions for tardiness/attendance and time clock violations and on two occasions regarding the need to keep communications professional and respectful. For example, in an "Employee Conversation Note" dated September 8, 2003, a manager wrote that plaintiff had missed a scheduled meeting and had not called in to excuse himself, and stated that "this is not appropriate behavior for someone interested in being a manager." Plaintiff responded in writing that he had not felt well, that favoritism, disrespect and personal conflict among other front-end employees "is hurting [his] development here at Chase-Pitkin," and that "if Chase-Pitkin wanted a[n] African-American in any management position, they would have hired one a long time ago."

Chase-Pitkin terminated plaintiff on July 6, 2004 for poor performance based on the overages and shortages in his cash drawer. McNeill's declaration explains:

> As a retail home improvement center, one of Chase-Pitkin's foremost priorities was to ensure the highest level of customer satisfaction. One of the

ways that Chase-Pitkin sought to meet this goal was to minimize overages and shortages in sales transactions.

All employees handling customer sales transactions were encouraged to take proper care to ensure that correct payment was received from the customer and that the customer was given his or her correct change. The Company also implemented and followed a cash control procedure for balancing cashier tills and addressing overages and shortages.

Pursuant to the policy, accounting office personnel at each store balanced employees' cash tills on a daily basis to ensure that the total cash, check, and electronic fund transfer ("ICOT" or "EFT") payments balanced against a register report downloaded from the system.

If a cashier showed a discrepancy of $5.00 or more, the accounting office personnel reviewed the cashier's "journal tape," which itemized each sales transaction, in an attempt to locate the discrepancy. Overages and shortages of $5.00 or more were reported to the Front-End Manager at each store and also to corporate headquarters.

If a cashier incurred an overage or shortage of more than $10.00, the overage or shortage was recorded on an "over/short explanation form," which was presented to and discussed with the employee. If the source of the discrepancy/error could be identified, it was noted on the form. Employees were given an opportunity to provide comments and further explanation on the over/short explanation forms.

If left unchecked, repeated cash errors would have the potential to negatively impact customer satisfaction and also Chase-Pitkin's bottom line in terms of revenues. Thus, in addition to outlining the procedures for balancing tills and researching and documenting overages and shortages, the policy also outlined procedures for disciplining employees who incurred repeated overages and shortages in their tills:

- For a first overage or shortage over $10.00, management issued a conversation note to the employee.
- For a second overage or shortage over $10.00, employees were to be written up and, based on management's discretion, suspended without pay.
- For a third overage or shortage over $10.00, management was given discretion to terminate the employee.

During his tenure with Chase-Pitkin, Hector had a long and demonstrated history of errors in his cash tills. Though other employees incurred periodic

overages and shortages, no other employee had the chronic history of errors that Hector demonstrated.

From the period September 2002 through July 2004, Hector incurred nineteen (19) overages and shortages over $10.00, as follows:

| Date of Occurrence | Overage/Shortage |
|---|---|
| 09-13-02 | +15.11 (cash) |
| 11-01-02 | -10.08 (check) |
| 12-13-02 | -12.83 (cash) |
| 02-28-03 | -22.20 (cash) |
| 10-08-03 | -55.01 |
| 10-10-03 | +19.80 (cash) |
| 10-31-03 | + 9.95 (cash) |
| 11-17-03 | -16.54 |
| 12-15-03 | -10.10 (cash) |
| 01-18-04 | +67.09 (cash/EFT) |
| 02-26-04 | -10.12 (cash) |
| 03-19-04 | +10.24 (cash) |
| 03-30-04 | -33.06 (cash/check) |
| 04-17-04 | +11.20 (cash) |
| 04-23-04 | -41.36 |
| 04-24-04 | +10.32 (cash) |
| 05-15-04 | -15.09 (EFT) |
| 05-19-04 | -10.68 (cash) |
| 07-02-04 | -18.43 (check) |

With each overage or shortage identified above, Chase-Pitkin management presented Hector with an over/short explanation form and afforded him an opportunity to provide further comments and/or explanation regarding the errors. In many instances, Hector took advantage of the opportunity to provide further comment or explanation.

In addition to reviewing over/short explanation forms with Hector, management also provided him with formal notice that he needed to improve the accuracy of his tills or he would face possible discipline, including termination:

- On December 19, 2003, after Hector incurred nine (9) overages/shortages, Beck issued an Employee Conversation Note to Hector. Beck advised Hector that he needed to be more careful when taking cash and giving customer change.
- On January 18, 2004, Beck issued a second Employee Conversation Note to Hector after he incurred an overage of $67.09, which was, in

part, related to Hector's improper processing of a gift card.

- Just three (3) weeks later, Hector incurred another cash shortage, which led to the issuance of a third Employee Conversation Note on February 9, 2004.

- On April 2, 2004, Lyons and Operations Manager Scott Augenreich administered a written warning to Hector based on excessive errors in his till. To that point in time, Hector had incurred thirteen (13) overages/shortages of $10.00 or more. The written warning specifically informed Hector that his next shortage over $10.00 could result in discipline, including suspension or termination.

- Thereafter, Hector incurred three additional overages/shortages, on April 17, 2004 (+11.20), April 23, 2004 (-41.36), and April 24, 2004 (+10.32), respectively. On April 26, 2004, Lyons and I issued a second written warning to Hector and placed him on a one-week suspension. Lyons and I informed Hector that his next overage/shortage over $10.00 would result in the termination of his employment.

- Hector's till was short on May 15, 2004 and May 19, 2004. However, because an investigation into the errors showed that the tills in question were used by multiple employees at the service desk, it was decided not to terminate Hector at that time. Notwithstanding, Lyons and I informed Hector that he was still on written warning.

On July 2, 2004, Hector's till was short $18.43 due to a missing check.

Lyons and I met with Hector on July 6, 2004 regarding the shortage. During the meeting, Hector explained that he may have thrown the check in question into the garbage. Based on Hector's long and demonstrated history of errors and his failure to improve his accuracy, despite repeated counseling and warnings, Lyons and I determined that there was no choice but to terminate Hector's employment effective immediately.

(Paragraph numbering and references to record omitted.)  A declaration from Riley, Chase-Pitkin's human resources director at the times in question, confirms McNeill's declaration.

The record contains the Over/Short Explanation form issued by a manager and signed by plaintiff with respect to each of plaintiff's overages and shortages.  It also contains written records of each "Employee Conversation" and other disciplinary actions.  Plaintiff submitted written responses regarding certain overages and shortages.  For example, regarding the $67.09

-10-

overage on January 18, 2004, he responded: "I do not remember any cash overage unless I was handed new bills stuck together."  And on February 9, 2004, with respect to a $10.12 shortage, he wrote that there was a "chance" that the customer was given "too much change."  On another occasion (April 17 or 19, 2004), he stated he did not give the customer correct change.  Regarding the shortage of $41.38 on April 23, 2004, he states that the customer gave him a $50 bill and he thinks he "gave the customer back in change what his purchase had totaled to."  Regarding the $10.32 cash overage on April 24, 2004, he stated that there were several employees operating a cash register with his employee number at the service desk before the start of his shift.

In an "Employee Conversation Note" with respect to shortages on May 15 and 19, 2004, Lyons and McNeill determined not to terminate plaintiff because "another individual had been running on the same till."  They noted, however, that plaintiff was "still on written warning for previous shortages as documented on April 26, 2004."  Plaintiff signed this note.

The Court has reviewed all documents and declarations in the record.  They contain no references to plaintiff's race, except for plaintiff's own statements that he was not promoted because he was black, that the people he supervised did not like him because he was black, that the three co-employees made their harassment complaints against him because he was black, and that Chase-Pitkin decided to terminate him because he was black.

The Court has also reviewed the 234-page transcript of plaintiff's deposition testimony in this action.  Plaintiff repeatedly expressed his view that the reason given for his termination was false because many people used the cash registers and thus it was impossible to ascertain who was responsible for any shortages or overages.  As demonstrated above, management recognized on two occasions that someone else had been using plaintiff's cash register and/or employee number.

-11-

However, nothing in the record would support a conclusion that on most other occasions when plaintiff had overages or shortages, someone else had been using plaintiff's cash register and/or employee number.  Indeed, plaintiff raised this defense on only one other occasion (*i.e.*, April 24, 2004), and on many occasions he offered a different explanation.

In his deposition testimony, plaintiff alleged only one specific incident when anyone referred to his race: during a bantering conversation involving two female co-employees, one of them asked plaintiff whether it was true that black men were sexually well-endowed.  Apart from this comment, which plaintiff said he verbally reported to McNeill, his deposition transcript contains no specific allegation of any race-related comment.

### LEGAL STANDARD – SUMMARY JUDGMENT

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Even if the motion is unopposed, the Court may not grant summary judgment unless it determines that the moving party is entitled to judgment as a matter of law.  *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004).

If the Court, viewing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in the nonmovant's favor, determines that the movant has satisfied its burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial.  *See Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989).  Where the party opposing summary judgment is proceeding *pro se*, the court must read that party's papers liberally and interpret them to raise the

-12-

strongest arguments that they suggest.  *See McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).  Even a *pro se* nonmovant, however, must come forward with evidence showing the existence of a disputed issue of material fact, once the movant has carried its burden.  *See* Fed.R.Civ.P. 56(e); *see also Jermosen v. Coughlin*, 877 F.Supp. 864, 867 (S.D.N.Y. 1999).  It is well established in this Circuit that, where a party defaults in opposing a summary judgment motion, Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."  *Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).

The Local Rules of the Northern District provide a procedural framework for the resolution of summary judgment motions, placing the burden on the parties to present the evidence that either supports or defeats the motion.  The movant must first submit a Statement of Material Facts setting forth the undisputed facts upon which it relies and specific citations to the record where each fact is established.  See N.D.N.Y.L.R. 7.1(a)(3).  The Court must satisfy itself that the cited record evidence supports the movant's assertions of fact and that those facts show that the movant is entitled to judgment as a matter of law.  *See Vermont Teddy Bear*, 373 F.3d at 244.

Once the movant submits a properly supported Statement of Material Facts, the non-moving party must file a response thereto.  "Any facts set forth in the [movant's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."  *Id.* (emphasis in original).  The requirement that the nonmovant submit a responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly even when *pro se* litigants are involved.  *See, e.g., Wallmar-Rodriguez v. Felix Roma Bakery,* 2007 WL

-13-

1388120, *2 (N.D.N.Y.); *Van Loan v. Hartford Acc. and Indem. Co.*, 2006 WL 3782709,  *2

(N.D.N.Y.).  The Second Circuit has recognized the authority of district courts to institute local

rules governing summary judgment submissions, and has affirmed summary judgment rulings

enforcing such rules.   *See, e.g., New York State Teamsters Conf. Pension and Ret. Fund v.

Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005).  In this respect, the Second Circuit

notes: "Rules governing summary judgment practice are essential tools for district courts,

permitting them to efficiently decide summary judgment motions by relieving them of the

onerous task of 'hunt[ing] through voluminous records without guidance from the parties.'" *Id.* at

649 (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir.2001)) (alteration in original).

## DISCUSSION

### Race discrimination

Plaintiff claims that defendants discriminated against him based on his race by denying

him the promotions he sought and by terminating him.

### *Prima facie* case

The Court analyzes plaintiff's race discrimination claims under the burden-shifting

framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), which first

requires the plaintiff to prove, by a preponderance of the evidence, a *prima facie* case of

discrimination by the employer. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 446-47 (2d Cir.

1999).  To establish a *prima facie* case, plaintiff must show that (1) he is a member of a protected

class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4)

the action occurred under circumstances giving rise to an inference of race discrimination. *See

Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001).  The burden of establishing a

*prima facie* case is "minimal." *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  To

satisfy the second element of the test, a plaintiff need only possess the basic skills necessary for

performance of the job.  *See Slattery*, 248 F.3d at 92 ("[A]ll that is required is that the plaintiff

establish basic eligibility for the position at issue, and not the greater showing that he satisfies the

employer.").

 With respect to the failure-to-promote claims, plaintiff, an African-American, was hired as

Front-End Advisor and was considered for the promotions he sought, thus meeting the first two

requirements.  Factor three is met by the fact that he was not promoted.  With respect to factor

four, an inference of discrimination may arise from the fact that the promotions were given to

white employees.

 With respect to his termination, plaintiff was hired as a Front-End Advisor and performed

that job for over three years.  His termination constitutes an adverse employment action.  An

inference of discrimination may arise from his allegations that he was the only African-American

employee, that he was falsely accused of overages and shortages, and that he was fired.

**Non-discriminatory reason for employer's actions**

 In the second step of the *McDonnell Douglas* test, the burden of production shifts to the

employer to articulate a legitimate, nondiscriminatory reason for its actions.  *See Bickerstaff*, 196

F.3d at 446.  The defendant's burden of production is not a demanding one; it need only offer an

explanation for the employment decision.  *Id.*

 The evidence adduced by defendant, summarized above, amply demonstrates non-

discriminatory reasons for defendants' decisions to promote other employees to the positions

plaintiff sought and to terminate plaintiff.  Viewing the evidence in the light most favorable to

plaintiff and drawing all reasonable inferences in plaintiff's favor, the Court finds that defendants have made a strong evidentiary showing of non-discriminatory grounds for their actions.

**Pretext**

In the third step of the *McDonnell Douglas* process, the burden shifts back to the plaintiff.  Here, the Court considers whether plaintiff has presented evidence to demonstrate "that the proffered reason was not the true reason for the employment decision, and that race was."  *St. Mary's*, 509 U.S. at 508 (internal quote omitted).  "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false [then] merges with [his] ultimate burden to persuade the trier of fact that [he] has been the victim of intentional discrimination (*i.e.*, that an illegal discriminatory reason played a motivating role in the adverse employment decision)."  *Bickerstaff*, 196 F.3d at 446-47.

In considering pretext, this Court views the evidence in the light most favorable to plaintiff, draws all reasonable inferences in plaintiff's favor, and affords plaintiff the leniency to which he is entitled as a *pro-se* litigant.  The Court finds that defendants have demonstrated as a matter of law that the reasons given for the adverse employment decisions were not pretextual and that racial discrimination did not play a motivating role in those decisions.

First, with respect to non-promotion, plaintiff's statements to the effect that the people who were promoted were less qualified than he are wholly unsubstantiated.  Further, even accepting the unsupported premise that the reasons given by defendants for denying him the promotions were false, on this record no finder of fact could conclude that the real reason was racial discrimination.  Defendants adduce competent evidence that they were not motivated by racial bias.  Plaintiff's surmises, his observations about the racial makeup of Chase-Pitkin's staff,

and his reference to a single statement by a co-worker fall far short of raising a question of fact on the issue.

With respect to his termination, it is plaintiff's position that, because many people used each cash register, there was no way to establish that the overages and shortages were his fault, and therefore the reason given for his termination was false.  However, defendants' evidence, including plaintiff's written explanations for some of the overages and shortages, establishes that many of the overages and shortages were in fact plaintiff's responsibility. Further, as with the promotion issue, even accepting the unsupported premise that the reasons given by defendants for terminating plaintiff were false, the evidence demonstrates as a matter of law that racial bias was not the real reason.

**Failure to promote – timeliness**

Plaintiff's claims based on non-promotion fail for another reason: they are untimely. Under Title VII, a claimant must file a charge of discrimination with the EEOC within 300 days of the occurrence of the allegedly discriminatory conduct.  *See* 42 U.S.C. §2000e-5(e)(1). Plaintiff filed his EEOC claim on August 23, 2004, more than 300 days after he was denied the promotions in July 2002 and July 2003.  No view of the record would support a continuing violation claim.

**Criminal background check**

Plaintiff also claims that he suffered racial discrimination because when he applied for the job in April 2001, he was required to undergo a criminal background check, which was not required of white applicants.  McNeill's and Riley's declarations state that Chase-Pitkin did not require a criminal background check of any applicant, including plaintiff.

-17-

First, as defendants point out, any such claim is time-barred inasmuch as plaintiff's EEOC claim, filed on August 23, 2004, was not filed within 300 days of the alleged incident as required by 42 U.S.C. §2000e-5(e)(1).  As with the failure to promote claims, the evidence clearly does not support a claim of continuous conduct.  In any event, no adverse employment action stemmed from the alleged requirement, inasmuch as plaintiff was hired.  The record wholly supports defendants' denial that it treated plaintiff differently because of his race.

### Sex discrimination

Plaintiff also claims that he was a victim of sex discrimination.  As with plaintiff's claims of race discrimination, defendants have demonstrated as a matter of law the reasons given for the adverse employment decisions were not pretextual and that sexual discrimination did not play a motivating role in those decisions.

### Harassment, hostile workplace

Plaintiff appears to claim that defendants' conduct in making (allegedly) false accusations of overages and shortages on his cash register was a form of harassment.  The Court has already found that the record establishes that most of the overages and shortages were plaintiff's responsibility; therefore, the accusations of overages and shortages do not support a harassment claim.

Plaintiff also appears to claim that the alleged atmosphere of disrespect, favoritism, and lack of professionalism created a hostile workplace.  Only one allegation in this regard – the question by a co-worker about black men's sexual abilities – can reasonably be construed as being connected with plaintiff's race; this falls far short of raising a question of fact regarding a hostile workplace.  Plaintiff further claims that the (allegedly) false accusations of harassment by

-18-

three female co-workers constituted racially-motivated harassment of plaintiff.  Although plaintiff speculates that the accusations were racially motivated, nothing in the record (not even in plaintiff's written statements or deposition testimony) supports this conclusory speculation.  Nor is there a basis to impute liability to defendants for any conduct of plaintiff's co-workers.

Similarly, there is no support for a claim of harassment or hostile workplace based on plaintiff's gender.  Defendants have established that these claims fail as a matter of law.

### Unequal terms and conditions of employment

There is no evidence in the record to support a finding that plaintiff was subjected to unequal terms and conditions of employment due to his race or gender.  Defendants have established that these claims fail as a matter of law.

### Retaliation

Plaintiff claims that defendants retaliated against him for his complaints about racial and/or sexual discrimination by repeatedly falsely accusing him of cash register overages and shortages and ultimately by terminating him.  The *McDonnell Douglas* formulation applies to analysis of a retaliation claim.  *See Sumner v. United States Postal Serv.*, 899 F.2d 203, 208 (2nd Cir. 1990).  To establish a *prima facie* case of retaliation, plaintiff must show: (1) that he participated in a protected activity known to the employer, (2) that he suffered an adverse employment action, and (3) that a causal connection exists between the protected activity and the adverse employment action.  *See Tomka v. Seiler Corp*., 66 F.3d 1295, 1308 (2d Cir. 1995).  If a plaintiff makes out a *prima facie* case, the employer must come forward with a nondiscriminatory reason for the action.  If the employer does so, the plaintiff must show that the reason given is a pretext and the real reason is illegal discrimination.  *See McDonnell Douglas*, 411 U.S. at 802-04.

Even accepting that plaintiff has made out a *prima facie* case, the retaliation claim fails as a matter of law.  As discussed above, defendants have established that they had legitimate nondiscriminatory reasons for their actions, that the reasons were not pretextual, and that discrimination did not play a motivating role.  Moreover, as defendants point out, plaintiff failed to exhaust his retaliation claim because he failed to include it in his EEOC charge.

### Bribery

Plaintiff avers that in July 2003, defendants gave him a bonus payment as a "bribe" for him to stop making complaints of discrimination and misconduct and to sign a statement that he was not discriminated against.  This allegation does not state a cause of action, nor does it provide meaningful support for plaintiff's other claims as discussed above.

### McNeill's liability

It is well-established that individuals cannot be held personally liable under Title VII.. *See Tomka*, 66 F.3d at 1313-14.  All claims against McNeill are dismissed on this ground as well.

### CONCLUSION

Based on defendants' evidentiary submissions, cited in their unopposed Statement of Material facts, the Court finds that defendants have demonstrated as a matter of law that they are entitled to summary judgment.  With respect to the employment discrimination claims, defendants have established that they had legitimate nondiscriminatory reasons for their actions and that neither discrimination nor retaliation played a motivating role.  Likewise, defendants have shown that plaintiff's other claims lack merit.

Moreover, due to plaintiff's *pro se* status, the Court has performed an independent review of the record, although it is not required to do so in view of plaintiff's failure to oppose the

motion. *See Amnesty America*, 288 F.2d at 470.  The Court finds that no rational trier of fact could find in favor of plaintiff because evidence supporting the essential elements of his claims is lacking.  There is no material factual dispute warranting denial of summary judgment.

It is therefore

ORDERED that defendants' motion for summary judgment (Dkt. No. 45) is granted; and it is further

ORDERED that the action is dismissed with prejudice.

IT IS SO ORDERED.

September 19, 2007
Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge